29th JUDICIAL DISTRICT COURT FOR THE PARISH OF ST. CHARLES

STATE OF LOUISIANA DIV. D

DOCKET NO. 89,168

JUDGE
M. LAUREN LEMMON   DIVISION "     "

TERRI CAMBRE, ET. AL.

FILED

VERSUS

UNION CARBIDE CORPORATION, ET. AL.

APR 26 2021

CLERK OF COURT
ST CHARLES PARISH LA

FILED:_____

_____
DEPUTY CLERK

## PETITION FOR DAMAGES AND REQUEST FOR TRIAL BY JURY

The Plaintiffs, through their undersigned counsel, represent, upon their information and belief, the following:

### INTRODUCTION

1. This lawsuit seeks redress for people who have lived near a petrochemical manufacturing facility near Hahnville operated by Union Carbide Corporation and/or Dow Chemical Company ("the facility") that has emitted dangerous levels of Ethylene Oxide ("EtO") for decades and which continues to emit dangerous levels of EtO as of the filing of this Petition. The Plaintiffs in this suit have all contracted breast cancer as a result of the emission of EtO from the facility and the Plaintiffs continue to be at risk for developing additional health problems in the future due to their continued exposure to EtO from the facility which has never abated at any time. The Defendants have long known of the dangerous effects of EtO as a carcinogen and had the ability to protect their neighbors by reducing or eliminating their emission of EtO, but instead chose, and continue to choose, to emit dangerous levels of EtO in the community surrounding the facility in order to maximize their profits without ever informing Plaintiffs or the rest of the surrounding community of the life-threatening effects of the facility's EtO emissions.

2. EtO is a cancer-causing gas.

3. The United States Environmental Protection Agency (EPA), the National Toxicology Program, the World Health Organization, and the International Agency for Research on Cancer (IARC) all classify EtO as a known human carcinogen.

1

4. Over decades and continuing to the present day, the facility has emitted many hundreds of tons of EtO into the air, forcing Plaintiffs to breathe its toxic emissions day after day.

5. Although the owners and operators of the facility know and have long known of hazards of EtO, they have chosen to protect their profits rather than the health of their neighbors and have continued to emit dangerous levels of EtO in amounts that caused the surrounding communities to have dangerously high EtO concentrations.

6. EtO is colorless and odorless and therefore Plaintiffs have never been able to see or smell the EtO that is in the air around them and which they have breathed.

7. Plaintiffs were unknowingly exposed to and inhaled dangerous levels of EtO in the air from the facility.

8. The Plaintiff's inhalation of the EtO emitted from the facility was a substantial factor in causing them to develop breast cancer.

9. The continued emission of EtO from the facility continues to cause damage by weakening Plaintiff's current medical condition and increasing the risk of Plaintiffs' developing new health problems.

## JURISDICTION AND VENUE

10. Venue is proper in this judicial district pursuant to Louisiana Code of Civil Procedure Articles 42, 73 and 74 because St. Charles parish it is the domicile of defendants Jorge Cerame, Donald Eastepp, and Brian Eiler, it is where the wrongful conduct of defendants occurred, and it is the parish where Plaintiffs have sustained damages.

11. This Court has original jurisdiction over this action as a court of general jurisdiction authorized to conduct both ordinary and special proceedings, including awarding damages, costs, and attorney's fees for tortious conduct and violations of Louisiana law.

## PLAINTIFFS

12. Quincee Berthelot is person of the age of majority who is domiciled in St. Charles parish. Ms. Berthelot has been and continues to be exposed to EtO from the facility at her home located at 51 River Park Dr, Hahnville, LA, 70057. She is 62 years old and was diagnosed with breast cancer on November 7, 2019. She has lived near the facility her entire life. She continues to experience adverse health effects because of the continued emission of EtO from the facility and is at risk for developing new health conditions as a result of the continued dangerous emission of EtO from the facility.

13. Terri Cambre is person of the age of majority who is domiciled in St. Charles parish. Ms. Cambre has been and continues to be exposed to EtO from the facility at her home located at 121 Mary St., Norco LA 70079. She is 51 years old and was diagnosed with breast cancer in 2014. She has lived near the facility her entire life. She continues to experience adverse health effects because of the continued emission of EtO from the facility and is at risk for developing new health conditions as a result of the continued dangerous emission of EtO from the facility.

14. Gia Lewis Grows is person of the age of majority who is domiciled in St. Charles parish. Ms. Grows has been and continues to be exposed to EtO from the facility at her home located at 128 Dufresne Dr Vacherie, LA 70090 and was exposed at her home located 425 Killona Drive, Killona, LA 70057 for her whole life until 2007. She is 46 years old and was diagnosed with breast cancer July 20, 2015. She continues to experience adverse health effects because of the continued emission of EtO from the facility and is at risk for developing new health conditions as a result of the continued dangerous emission of EtO from the facility.

15. Denise Marchese is person of the age of majority who is domiciled in St. Charles parish. Ms. Marchese has been and continues to be exposed to EtO from the facility at her home located at 172 Thoroughbred, Montz, LA 70068 since 2000. She is 55 years old and was diagnosed with breast cancer in August of 2019. She continues to experience adverse health effects because of the continued emission of EtO from the facility and is at risk for developing new health conditions as a result of the continued dangerous emission of EtO from the facility.

16. Pamela Meredith is person of the age of majority who is domiciled in St. Charles parish. Ms. Meredith has been and continues to be exposed to EtO from the facility at her home located at 9604 Red Church Ln, Destrehan, LA 70047 since 1995. She is 56 years old and was diagnosed with breast cancer in May of 2012. She continues to experience adverse health effects because of the continued emission of EtO from the facility and is at risk for developing new health conditions as a result of the continued dangerous emission of EtO from the facility.

17. Rosalie Myers is person of the age of majority who is domiciled in St. Charles parish. Ms. Marchese has been and continues to be exposed to EtO from the facility at her home located at 113 Duhe Dr, Hahnville LA 70057 since 2000.  She is 64 years old and was diagnosed with breast cancer on August 18, 2015. She continues to experience adverse health effects

because of the continued emission of EtO from the facility and is at risk for developing new health conditions as a result of the continued dangerous emission of EtO from the facility.

18. Yvonne Wolfe is person of the age of majority who is domiciled in St. Charles parish. Ms. Marchese has been and continues to be exposed to EtO from the facility at her home located at 514 Courthouse Lane, Hahnville LA 70057 since 1968.  She is 80 years old and was diagnosed with breast cancer in November of 2009. She continues to experience adverse health effects because of the continued emission of EtO from the facility and is at risk for developing new health conditions as a result of the continued dangerous emission of EtO from the facility.

### DEFENDANTS

19. Dow Chemical Company ("Dow") is a corporate organized under the laws of Delaware with its principal place of business in Michigan.

20. Union Carbide Corporation ("Union Carbide") is a corporation organized under the laws of New York with its principal place of busines in Texas. Upon information and belief, Union Carbide has operated the facility since 1966 and has been a wholly owned subsidiary of Dow since 2001.

21. Jackie Yaworski is a person of the full age of majority who is domiciled in Orleans parish. Ms. Yaworski was the production leader who was the designated "Permit Responsible Official" on permits issued by the Louisiana Department of Environmental Quality ("LDEQ") that apply to Union Carbide and/or Dow's EtO emissions in 2020.

22. Jorge Cerame is a person of the full age of majority who is domiciled in St. Charles parish. Mr. Cerame was the environmental health and safety leader who was the designated "Permit Responsible Official" on permits issued by the LDEQ that apply to Union Carbide and/or Dow's EtO emissions in 2019.

23. Donald Eastepp is a person of the full age of majority who is domiciled in St. Charles parish. Mr. Eastepp was the production leader who was the designated "Permit Responsible Official" on permits issued by the LDEQ that apply to Union Carbide and/or Dow's EtO emissions in 2017.

24. Brian Eiler is a person of the full age of majority who is domiciled in St. Charles parish. Mr. Eastepp was the production leader who the designated "Permit Responsible Official" on

4

permits issued by the LDEQ that apply to Union Carbide and/or Dow's EtO emissions in 2016, 2017, and 2018.

25. Michael Faulkner is a personal of the full age of majority domiciled in St. Tammany parish. Mr. Faulkner was a production leader who the designated "Permit Responsible Official" on permits issued by the LDEQ that apply to Union Carbide and/or Dow's EtO emissions in 2005, 2008, 2009, 2013, 2015, and 2016.

**FACTUAL BACKGROUND**

26. Ethylene oxide is a flammable, colorless gas used to make other chemicals that are used in making a range of products, including antifreeze, textiles, plastics, detergents and adhesives. Ethylene oxide also is used to sterilize equipment and plastic devices.[1]

27. The facility emits huge volumes of EtO every year into the community where Plaintiffs reside and the emissions continue at this time.

28. People cannot see or smell ethylene dioxide and, consequently, Plaintiffs have been exposed to EtO from the facility for many years without their knowledge while Defendants knew, or should have known, that that the EtO from the facility was dangerous, toxic, carcinogenic, mutagenic, and harmful to local residents.

29. EtO is one of 187 pollutants that EPA has classified as "hazardous air pollutants," also called "air toxics." It is dangerous, toxic, carcinogenic, and mutagenic. EtO is highly reactive, readily taken up by the lungs, efficiently absorbed into the blood stream, and easily distributed throughout the human body. Its deleterious properties have been widely known for decades in the industrial community, but not to the general population.

30. Studies show that long-term exposure to EtO increases the risk of cancers of the white blood cells, including, but not limited to, non-Hodgkin lymphoma, myeloma, and lymphocytic leukemia. Studies also show that long-term exposure to EtO increases the risk of breast cancer.

31. The DNA-damaging properties of EtO have been studied since the 1940s.

---

[1] https://www.epa.gov/hazardous-air-pollutants-ethylene-oxide/background-information-ethylene-oxide#what

32. U.S. companies became broadly aware of EtO's carcinogenic effects in 1977, when the National Institute of Occupational Safety and Health (NIOSH) recommended that EtO be considered as mutagenic and potentially carcinogenic to humans.[2]

33. Union Carbide was specifically aware of the effects of EtO because the 1977 NIOSH study was based on workers at a Union Carbide facility in South Carolina.

34. In 1981, based on additional lab studies wherein EtO induced cancer in animals, NIOSH reconfirmed its concerns that EtO was a potential occupational carcinogen.[3]

35. In 1985, the U.S. Department of Health and Human Services published the Fourth Annual Report on Carcinogens and classified EtO as reasonably anticipated to be a human carcinogen.

36. California declared EtO as a human carcinogen in 1987.

37. In 1994, the World Health Organization listed EtO as a Group 1 human carcinogen, the agency's highest risk classification.

38. In 2000, the U.S. Department of Health and Human Services revised classified EtO as "known to be a human carcinogen."

39. In 2002, the U.S. National Toxicology Program classified EtO as "known to be a human carcinogen" based on "sufficient evidence of carcinogenicity from studies in humans."

40. NIOSH published a study in 2004 found positive exposure-response trends for lymphohematopoietic cancer mortality in males and for breast cancer mortality in females.

41. An EPA advisory panel agreed in 2007 that EtO is a carcinogen and advised the EPA to make improvements to risk assessments.

42. In 2007, the American Chemistry Counsel and Ethylene Oxide/Ethylene Glycols Panel, of which Dow is a member, published a manual regarding EtO and noting the association between EtO and breast and blood cancers.

43. In 2009, California added EtO to list of toxic substances.

44. The EPA classified EtO as a human carcinogen and increased the cancer risk value for EtO in December 2016, estimating the chemical to be 30 times more carcinogenic to adults that

---

[2]  Center for Disease Control & Prevention, Special Occupational Hazard Review with Control Recommendations: Use Of Ethylene Oxide As A Sterilant In Medical Facilities, August 1977, https://www.cdc.gov/niosh/docs/77-200/default.html

[3]  Center for Disease Control, Current Intelligence Bulletin 35, May 1981, Evidence of Carcinogenicity, https://www.cdc.gov/niosh/docs/81-130/default.html

previously thought. The EPA considers any exposure, however small, to create cancer risk. This is because EtO is a powerful mutagen and can damage DNA.

## Emissions from the Facility

45. The facility emits huge volumes of EtO gas every year which emissions contaminate the air in communities in proximity to the facility.

46. The EtO emitted by the facility remains in the air for months, becomes concentrated in atmospheric inversions, and moves through neighboring communities through prevailing winds. Because its half-life in the atmosphere is 211 days, EtO remains in the air that Plaintiffs breathe long after it has been emitted.[4]

47. People cannot see or smell ethylene oxide when it is in the air. As such, Plaintiffs have unknowingly been exposed to carcinogenic EtO for decades while Defendants knew, or should have known, that the EtO it was releasing was dangerous, toxic, carcinogenic, mutagenic, and harmful to local residents.

48. Defendants operate the facility without sufficient pollution controls to limit and/or eliminate the emissions of toxic EtO and, as a result, expose Plaintiffs to a carcinogenic, mutagenic chemical that materially diminished their health, increased their likelihood of developing cancer, and continues to increase their likelihood of developing cancer.

49. The facility continues to emit dangerous levels of EtO at the present time.

50. Not only does the facility emit state-authorized amounts of EtO into the atmosphere, which are still excessive and dangerous to persons working and living near the facility, but the facility releases unauthorized amounts of EtO into the air and water, which releases are caused by leaks, faulty equipment, and other negligence that has increased the volume of EtO in the atmosphere around the facility and in the community, including just by way of example, an unauthorized release of over 850 pounds of EtO into the atmosphere in September 2020 as a result of a leak and a failed seal.

## The Risk of Cancer Near the Facility is the Highest in the U.S.

51. In August 2018, after the EPA released the results of the 2014 National Air Toxics Assessment ("NATA") of EtO (and other toxics), it became harder for the defendants to ignore or attempt to deny the hazardous nature of EtO. The 2014 NATA—which estimated concentrations of airborne toxins and population exposure and calculated the associated risks

---

[4]      https://www.ncbi.nlm.nih.gov/books/NBK321408/

of cancer and other serious health problems—reflects that there are dangerous levels of airborne EtO in certain census tracts around the facility. Even worse, the report calculated that individuals living in those census tracts around the facility, which include the Plaintiffs, have some of the highest risks of cancer from EtO exposure in the country up to 7 times what the EPA considers an acceptable risk. On information and belief, the 2014 NATA results were not communicated to any lay persons and the citizens of St. Charles Parish, although the EPA inspector general issued a management alert that called on the EPA, state, and/or local officials to provide information about EtO to Plaintiffs. There was no public awareness initiative or campaign by Union Carbide, Dow, or the local or federal government to educate the community. Although Defendants acknowledged reviewing the NATA report regarding the dramatically increased risk of cancer its EtO emissions created for the persons working and living around the facility and gave lip-service to "exploring" "ethylene oxide emission reduction opportunities" at its facility, it has continued to emit large volumes of EtO into the atmosphere, with annual amounts increasing again in the last few years.

### Individuals at Union Carbide and/or Dow with Authority and the Responsibility to Protect the Citizens of St. Charles Parish Knew the Emissions Were Dangerous, But Did Nothing

52. Jackie Yaworski, Jorge Cerame, Donald Eastepp, Brian Eiler, and Michael Faulkner (collectively the "Facility Manager Defendants") were each designated to the LDEQ as a Permit Responsible Official ("PRO") for the permits under which the facility operated and emitted EtO from 2015 to 2020. As PROs, the Facility Manager Defendants were certified to the state to be either officers in charge of a principal business function or to have similar policy and decision-making functions for the corporate defendants and the facility and to be authorized persons responsible for overall operations of the EtO emitting units and plants at the facility. As PROs, the Facility Manager Defendants were personally responsible for ensuring Union Carbide and/or Dow's compliance with these permits. By state regulation, that personal responsibility could not be delegated further to other individuals working at the facility.

53. In connection with being designated PROs, the Facility Manager Defendants personally certified that information provided to LDEQ regarding EtO emissions from the facility were true, accurate, and complete.

54. In connection with being a PRO, each of the Facility Manager Defendants exercised personal responsibility, management, and control over the facility's operations and handling and emissions of EtO.

55. In connection with being a PRO, each of the Facility Manager Defendants owed a personal duty to the community surrounding the facility, including Plaintiff, to not emit harmful emissions of EtO from the facility that could injure the members of community, including Plaintiffs.

56. Not only were each of the Facility Manager Defendants responsible for ensuring that the facility complied with the LDEQ permits—they were also the individuals directly and personally responsible for overall operations related to EtO emissions from the facility and emissions controls and had to certify as such in connection with being designated as a PRO. Union Carbide and/or Dow delegated to the Facility Manager Defendants the duty to ensure that the operations of the facility did not endanger the neighboring community through unsafe operations or dangerous levels of emissions.

57. The Facility Manager Defendants had actual knowledge of the potentially carcinogenic qualities of EtO much earlier than the 2018 release of the 2014 NATA results because their respective roles at the facility required them to be aware of the health effects of EtO which were widely known to those in in their industry to cause cancer before 2018, because Union Carbide and/or Dow had been studying EtO for decades and were well aware of reports of its toxicity to humans, and because respected organizations had already classified the chemical as reasonably anticipated to be carcinogenic to humans even before IRAC reported in 2010 and the EPA reported in 2016 that it was "carcinogenic to humans." The Facility Manager Defendants unquestionably knew that the EPA had concluded that EtO was a likely carcinogen, and that the facility's emissions of EtO greatly exceeded levels that would result in what the EPA considers an acceptable ambient air concentration.

58. On information and belief, each of the Facility Manager Defendants had the authority to shut down emissions of EtO from the facility and implement changes to emissions controls and systems necessary to reduce dangerous emissions of EtO, but none of the Facility Manager Defendants exercised their authority to take steps to protect the community surrounding the facility by reducing emission levels or shutting the facility down until emission levels could be lowered to safe levels.

59. Upon information and belief, Jackie Yaworski has been employed by Union Carbide and/or Dow since at least 2014 and has served as an Operation Excellence Leader. Ms. Yaworski was designated as a PRO by Union Carbide and/or Dow for emissions of EtO in 2020. Ms. Yaworski has had direct responsibility for EtO emissions and was personally responsible for ensuring Union Carbide and/or Dow's compliance with environmental regulations and laws and the permits issued by the LDEQ to the facility. Ms. Yaworski knew or should have known that people living in the surrounding community were and continue to be exposed to unsafe levels of EtO being emitted from the facility and that those people faced and still face an increased risk of developing cancer as a result of the emissions of EtO from the facility.

60. Upon information and belief, Jorge Cerame was employed by Union Carbide and/or Dow from 2008 to 2020 in various roles related to Environmental Health & Safety (EH&S). Upon information and belief, Mr. Cerame has a degree in chemical engineering. Mr. Cerame was designated as a PRO by Union Carbide and/or Dow for emissions of EtO in 2019. Mr. Cerame had direct responsibility for health, safety, and environmental issues related to EtO emissions. In his roles in EH&S, Mr. Cerame was personally responsible for ensuring Union Carbide and/or Dow's compliance with environmental regulations and laws and the permits issued by the LDEQ to the facility, and for implementing emission systems and controls to ensure the safety and welfare of Union Carbide and/or Dow's workers and the surrounding community. Mr. Cerame knew or should have known that people living in the surrounding community were being exposed to unsafe levels of EtO being emitted from the facility and that those people faced an increased risk of developing cancer as a result of the emissions of EtO from the facility.

61. Upon information and belief, Donald Eastepp has been employed by Union Carbide and/or Dow since March 2013 as a production leader and previously worked for Union Carbide and/or Dow from 2000 to 2010 as a production engineer and improvement engineer. Mr. Eastepp has a degree in chemical engineering. Mr. Eastepp was designated as a PRO by Union Carbide and/or Dow for emissions of EtO in 2017. Mr. Eastepp has had direct responsibility for EtO emissions and was personally responsible for ensuring Union Carbide and/or Dow's compliance with environmental regulations and laws and the permits issued by the LDEQ to the facility. Mr. Eastepp knew or should have known that people living in the surrounding community were and continue to be exposed to unsafe levels of EtO being

emitted from the facility and that those people faced and still face an increased risk of developing cancer as a result of the emissions of EtO from the facility.

62. Upon information and belief, Brian Eiler has been employed by Union Carbide and/or Dow since 2004 an operation leader and production leader. Mr. Eiler has a degree in chemical engineering. Mr. Eiler has been a member of the American Institute of Chemical Engineers since 1995. Mr. Eiler was designated as a PRO by Union Carbide and/or Dow for emissions of EtO in 2016, 2017, and 2018. Mr. Eiler has had direct responsibility for EtO emissions and was personally responsible for ensuring Union Carbide and/or Dow's compliance with environmental regulations and laws and the permits issued by the LDEQ to the facility. Mr. Eastepp knew or should have known that people living in the surrounding community were and continue to be exposed to unsafe levels of EtO being emitted from the facility and that those people faced and still face an increased risk of developing cancer as a result of the emissions of EtO from the facility.

63. Upon information and belief, Michael Faulkner has been employed by Union Carbide and/or Dow since 1989 as a production leader. Mr. Faulkner was designated as a PRO by Union Carbide and/or Dow for emissions of EtO in 2005, 2008, 2009, 2013, 2015, and 2016. Mr. Faulkner has had direct responsibility for EtO emissions and was personally responsible for ensuring Union Carbide and/or Dow's compliance with environmental regulations and laws and the permits issued by the LDEQ to the facility. Mr. Faulkner knew or should have known that people living in the surrounding community were and continue to be exposed to unsafe levels of EtO being emitted from the facility and that those people faced and still face an increased risk of developing cancer as a result of the emissions of EtO from the facility.

**Defendants' continued actions continue to cause injury to Plaintiffs.**

64. The facility has continuously emitted dangerous levels of EtO that are inhaled by Plaintiffs and the tortious emission of EtO has never abated.

65. Plaintiffs continue to suffer injury as a result of the Defendants' failure to abate the dangerous emission of EtO.

66. Though all Plaintiffs have already developed cancer, Plaintiffs have an increased risk of developing additional illnesses, including cancer, as a result of the unabated emission of dangerous levels of EtO from the facility.

67. Plaintiffs' injuries to date and risk of future health problems are both the result of continuous, indivisible, and compounding tortious activities by Defendants.

**The Plaintiffs did not reasonably know that it was the Defendants' acts and omissions described above that caused their injuries and damages until less than a year before this lawsuit was filed.**

68. As a result of the above-described acts and omissions by all of the Defendants, exposure to the unsafe levels of EtO from the Facility was a substantial factor in each Plaintiff's development of cancer and is a substantial factor in development of future health problems

69. Defendants' misrepresentations about the carcinogenic quality of EtO impeded the Plaintiffs' ability to assert the causes of action stated herein and Defendants' actions and inactions did, in fact, delay the Plaintiffs' discovery that the cancers and risks of cancer alleged herein had been caused by exposure to EtO.

70. Although some of the Plaintiffs were diagnosed more than one year prior to the date of this Petition, none of the Plaintiffs knew or reasonably should have known that their cancer to date was caused by exposure to the EtO emitted by the facility before one year prior to the date of this Petition.

71. All Plaintiffs continue to be exposed to unsafe levels of EtO from the facility and face an ongoing risk of adverse effects to their health and development of additional cancer.

72. Denise Marchese lives within 3 miles of the facility and was diagnosed with breast cancer in August of 2019. No physician ever advised her that her cancer may have been caused by exposure to EtO so as to reasonably put her on notice of her cause of action against Defendants. She did not know she was exposed to dangerous amounts of EtO since it is colorless and odorless and Defendants have never advised the general public of the dangers of EtO. The first time she had any reason to think that EtO emission from the facility was a substantial factor in causing her breast cancer was when she received an advertisement in the mail from The Voorhies Law Firm on or after April 28, 2020. The advertisement advised that people living near the facility may have legal rights because of the emissions of EtO from the facility. That was the first indication she had that EtO exposure may have been a substantial factor in causing her cancer. Thereafter she took reasonable steps to investigate whether exposure to EtO had caused her cancer or created a risk of future cancer. She filed this action within one year of learning facts supporting that she had a cause of action against

12

Defendants. No one from the local, state, or federal government has directly provided her any warning about EtO emitted by the facility.

73. Pamela Meredith lives within 5 miles of the facility and was diagnosed with breast cancer in May of 2012. No physician ever advised her that her cancer may have been caused by exposure to EtO so as to reasonably put her on notice of her cause of action against Defendants. She did not know she was exposed to dangerous amounts of EtO since it is colorless and odorless and Defendants have never advised the general public of the dangers of EtO. The first time she had any reason to think that EtO emission from the facility was a substantial factor in causing her breast cancer was when she received an advertisement in the mail from The Voorhies Law Firm on or after April 28, 2020. The advertisement advised that people living near the facility may have legal rights because of the emissions of EtO from the facility. That was the first indication she had that EtO exposure may have been a substantial factor in causing her cancer. Thereafter she took reasonable steps to investigate whether exposure to EtO had caused her cancer or created a risk of future cancer. She filed this action within one year of learning facts supporting that she had a cause of action against Defendants. No one from the local, state, or federal government has directly provided her any warning about EtO emitted by the facility.

74. Gia Lewis Grows lived within 3 miles of the facility until 2007 and was diagnosed with breast cancer in July of 2015. No physician ever advised her that her cancer may have been caused by exposure to EtO so as to reasonably put her on notice of her cause of action against Defendants. She did not know she was exposed to dangerous amounts of EtO since it is colorless and odorless and Defendants have never advised the general public of the dangers of EtO. The first time she had any reason to think that EtO emission from the facility was a substantial factor in causing her breast cancer was when she received an advertisement in the mail from The Voorhies Law Firm on or after April 28, 2020. The advertisement advised that people living near the facility may have legal rights because of the emissions of EtO from the facility. That was the first indication she had that EtO exposure may have been a substantial factor in causing her cancer. Thereafter she took reasonable steps to investigate whether exposure to EtO had caused her cancer or created a risk of future cancer. She filed this action within one year of learning facts supporting that she had a cause of action against

Defendants. No one from the local, state, or federal government has directly provided her any warning about EtO emitted by the facility.

75. Terri Cambre lives within 3 miles of the facility and was diagnosed with breast cancer in 2014 or 2015. No physician ever advised her that her cancer may have been caused by exposure to EtO so as to reasonably put her on notice of her cause of action against Defendants. She did not know she was exposed to dangerous amounts of EtO since it is colorless and odorless and Defendants have never advised the general public of the dangers of EtO. The first time she had any reason to think that EtO emission from the facility was a substantial factor in causing her breast cancer was when she received an advertisement in the mail from The Voorhies Law Firm on or after April 28, 2020. The advertisement advised that people living near the facility may have legal rights because of the emissions of EtO from the facility. That was the first indication she had that EtO exposure may have been a substantial factor in causing her cancer. Thereafter she took reasonable steps to investigate whether exposure to EtO had caused her cancer or created a risk of future cancer. She filed this action within one year of learning facts supporting that she had a cause of action against Defendants. No one from the local, state, or federal government has directly provided her any warning about EtO emitted by the facility.

76. Quinece Berthelot lives within 3 miles of the facility and was diagnosed with breast cancer in November of 2019. No physician ever advised her that her cancer may have been caused by exposure to EtO so as to reasonably put her on notice of her cause of action against Defendants. She did not know she was exposed to dangerous amounts of EtO since it is colorless and odorless and Defendants have never advised the general public of the dangers of EtO. The first time she had any reason to think that EtO emission from the facility was a substantial factor in causing her breast cancer was when she received an advertisement in the mail from The Voorhies Law Firm on or after April 28, 2020. The advertisement advised that people living near the facility may have legal rights because of the emissions of EtO from the facility. That was the first indication she had that EtO exposure may have been a substantial factor in causing her cancer. Thereafter she took reasonable steps to investigate whether exposure to EtO had caused her cancer or created a risk of future cancer. She filed this action within one year of learning facts supporting that she had a cause of action against

Defendants. No one from the local, state, or federal government has directly provided her any warning about EtO emitted by the facility.

77. Rosalie Myers lives within 3 miles of the facility and was diagnosed with breast cancer in August of 2015. No physician ever advised her that her cancer may have been caused by exposure to EtO so as to reasonably put her on notice of her cause of action against Defendants. She did not know she was exposed to dangerous amounts of EtO since it is colorless and odorless and Defendants have never advised the general public of the dangers of EtO. The first time she had any reason to think that EtO emission from the facility was a substantial factor in causing her breast cancer was when she received an advertisement in the mail from The Voorhies Law Firm on or after April 28, 2020. The advertisement advised that people living near the facility may have legal rights because of the emissions of EtO from the facility. That was the first indication she had that EtO exposure may have been a substantial factor in causing her cancer. Thereafter she took reasonable steps to investigate whether exposure to EtO had caused her cancer or created a risk of future cancer. She filed this action within one year of learning facts supporting that she had a cause of action against Defendants. No one from the local, state, or federal government has directly provided her any warning about EtO emitted by the facility.

## CAUSES OF ACTION

### Count 1 – Negligence of Union Carbide and/or Dow

78. Union Carbide and/or Dow had duty to operate the facility in such a way as to avoid an unreasonable risk of harm to persons located in the surrounding areas, including the Plaintiffs.

79. Union Carbide and/or Dow knew that a person's exposure to EtO in the ambient air could cause cancer and that EtO was being emitted from the facility into the ambient air around the facility in levels that far exceeded what the EPA would consider acceptable.

80. Union Carbide and/or Dow knew or should have known that that its/their EtO emissions were likely to cause adverse health effects in the neighboring exposed population.

81. As the operator of the facility with control over the levels of EtO released from the facility, Union Carbide and/or Dow owes a duty of ordinary care to persons foreseeably within the reach of those airborne chemicals' known dangers to reduce emissions to a level that do not pose an unreasonable risk of harm. Union Carbide and/or Dow has breached that duty by,

among other things, emitting EtO from facility in amounts that create an unreasonable and foreseeable risk of harm to persons located in the neighboring community, including the Plaintiffs. Furthermore, Union Carbide and/or Dow's actions actually caused harm to persons located in the surrounding areas, including the harms suffered by the Plaintiffs.

82. Union Carbide and/or Dow's actions were both a cause in fact and legal cause of these harms. Union Carbide and/or Dow's actions and omissions continue to cause continuous damages and harm to the Plaintiffs.

83. The facility has at all relevant times been in the custody and control of Union Carbide and/or Dow.

84. Union Carbide and/or Dow knew or should have known that the emission EtO from the facility was a vice or defect creating an unreasonable risk of harm to persons located in the surrounding areas, including the Plaintiffs.

85. Union Carbide and/or Dow could have prevented the harms suffered by the Plaintiffs through the exercise of reasonable care, namely by reducing or eliminating the emission of EtO from the facility. Union Carbide and/or Dow failed to exercise such reasonable care, and its failure is both a cause in fact and legal cause of Plaintiff's damages.

86. Union Carbide and/or Dow's actions and omissions continue to cause continuous damages and harm to the Plaintiffs.

87. Union Carbide and/or Dow has been, and continues to be, negligent in the following non-exclusive ways:

    a.)    Emitting large volumes of EtO into the air around the facility with knowledge of the risks and dangers posed to the neighboring community,

    b.)    Failing to inform and warn the neighboring community that they had a high risk of developing cancer as a result of exposure to the EtO released into the air from the facility;

    c.)    Failing to timely or adequately take steps to lower emissions of EtO to a safe level;

    d.)    Failing to operate strictly in compliance with the LDEQ permits issued to the facility to ensure that at the actual volumes and levels of emissions of EtO would be known;

e.)     Failing to properly train, monitor, and supervise its employees in the inspection and monitoring of the facility's systems and equipment to ensure adequate control as to the dangerous emissions released into the community;

f.)     Failing to take proper preventative measures/safeguards to avoid exposing the Plaintiffs to dangerous levels of EtO;

g.)     Failing to know what it should have known;

h.)     Misleading the Plaintiffs and the community as to the serious health risks and dangers they face as a result of living in close proximity to the facility and inhaling EtO.

### Count 2 – Union Carbide and/or Dow's Liability for Civil Battery

88.   At all relevant times, Union Carbide and/or Dow intended to release emissions of EtO from the facility.

89.   Union Carbide and/or Dow knew that the intended emissions of EtO from the facility would make contact with and be inhaled by the individuals living in close proximity to the facility, which included Plaintiffs.

90.   Union Carbide and/or Dow also knew to a substantial certainty that inhalation of EtO would cause serious health risks and increased risks of cancer to those individuals living in close proximity to the facility who inhaled the chemical.

91.   The Plaintiffs did not know that they were inhaling EtO until within the last year and thus had never consented to making contact with or inhaling the chemical; nor do they consent to inhaling EtO today.

92.   As a direct and proximate result of the facility's emissions of EtO, Plaintiffs were contacted by and inhaled dangerous levels of EtO without their consent.

93.   As a direct and proximate result of their nonconsensual inhalation of Union Carbide's and/or Dow's intended emissions of EtO from the facility, Plaintiffs developed cancer and have an increased risk of further serious health risks and medical conditions.

### Count 3 – Union Carbide and/or Dow's Liability under La. C.C. arts. 667-669

94.   Union Carbide and/or Dow has a duty under Louisiana's vicinage articles to avoid operations at the facility that cause damages and inconvenience to the facility's neighbors.  Union Carbide and/or Dow is required to use its property - the facility - in such a manner as not to injure its neighbors.

95. Plaintiffs live near the facility and were, and continue to be, continuously exposed to the dangerous emissions of EtO released by the facility, which exposure was a cause of Plaintiffs' respective cancers and Plaintiff's risk of further health problems. Plaintiffs all live or have lived in close proximity to the facility and have been and continued to be damaged by their exposure to the dangerous emissions released by the facility.

96. Union Carbide and/or Dow knew or in the exercise of reasonable care should have known that its operations and emissions of EtO from the facility would cause damages persons living near the facility, including these Plaintiffs. The damages caused to these Plaintiffs could have been prevented if Union Carbide and/or Dow had exercised reasonable care to reduce or eliminate the emissions of dangerous chemicals into the air upon its purchase of the facility, but it/they failed to take any steps to reduce EtO emissions and it/they still have not reduced EtO emissions to a level demonstrated to be safe and not to cause adverse health effects to Union Carbide and/or Dow's neighboring community.

**Count 4- Negligence of Jackie Yaworski**

97. Ms. Yaworski, in connection with designation as a PRO, was specifically delegated duties owed by Union Carbide / and Dow to Plaintiffs.

98. Ms. Yaworski failed to exercise reasonable care and breached duties to Plaintiffs by allowing the facility to continue to emit EtO, in amounts that created an unreasonable and foreseeable risk of harm to persons located in the surrounding areas, including the Plaintiffs, and by allowing permit violations, which, on information and belief, contributed to the unsafe levels of EtO in the ambient air, despite her own personal knowledge of the health risks and increased risk of cancer posed by the high level of emissions.

99. Instead of taking steps that she had the personal ability to take to implement designs or systems that would reduce the levels of dangerous emissions of EtO and warn the facility's neighbors as to the health risks the facility created by EtO, Ms. Yaworski caused Plaintiffs to be exposed to dangerous levels of EtO from the facility.

100. Ms. Yaworski has had actual knowledge of the risk to Plaintiffs as a result of the emission of EtO from the facility and breached the duty owed to Plaintiffs that was delegated to her by Union Carbide and/or Dow, which could not be further delegated to subordinates by state regulations, by exposing Plaintiffs to unsafe amounts of EtO.

18

101. Ms. Yaworski's breach of the personal duty to Plaintiffs is a specific cause of Plaintiffs' damages; her acts and omissions were and continue to be a significant contributing cause of the Plaintiffs' harms.

#### Count 5 – Civil Battery by Jackie Yaworski

102. At all relevant times, Ms. Yaworski intended for the facility to release emissions of EtO and was personally responsible for those intended emissions.

103. Ms. Yaworski knew that the intended emissions of EtO from the facility would make contact with and be inhaled by the individuals living in close proximity to the facility, which included Plaintiffs.

104. Ms. Yaworski also knew to a substantial certainty that inhalation of EtO would cause serious health risks and increased risks of cancer to those individuals living in close proximity to the facility who inhaled the chemical.

105. The Plaintiffs did not know that they were inhaling EtO until within the last year and thus had never consented to making contact with or inhaling the chemical; nor do they consent to inhaling EtO today.

106. As a direct and proximate result of the facility's emissions of EtO, Plaintiffs were contacted by and inhaled dangerous levels of EtO without their consent.

107. As a direct and proximate result of their nonconsensual inhalation of the intended emissions of EtO from the facility, Plaintiffs developed cancer and have an increased risk of further serious health risks and medical conditions.

#### Count 6 – Negligence of Jorge Cerame

108. Mr. Cerame, in connection with designation as a PRO, was specifically delegated duties owed by Union Carbide / and Dow to Plaintiffs.

109. Mr. Cerame failed to exercise reasonable care and breached duties to Plaintiffs by allowing the facility to continue to emit EtO, in amounts that created an unreasonable and foreseeable risk of harm to persons located in the surrounding areas, including the Plaintiffs, and by allowing permit violations, which, on information and belief, contributed to the unsafe levels of EtO in the ambient air, despite his own personal knowledge of the health risks and increased risk of cancer posed by the high level of emissions.

110. Instead of taking steps that he had the personal ability to take to implement designs or systems that would reduce the levels of dangerous emissions of EtO and warn the facility's

neighbors as to the health risks the facility created by EtO, Mr. Cerame caused Plaintiffs to be exposed to dangerous levels of EtO from the facility.

111.  Mr. Cerame has had actual knowledge of the risk to Plaintiffs as a result of the emission of EtO from the facility and breached the duty owed to Plaintiffs that was delegated to him by Union Carbide and/or Dow, which could not be further delegated to subordinates by state regulations, by exposing Plaintiffs to unsafe amounts of EtO.

112.  Mr. Cerame's breach of the personal duty to Plaintiffs is a specific cause of Plaintiffs' damages; her acts and omissions were and continue to be a significant contributing cause of the Plaintiffs' harms.

## Count 7 – Civil Battery by Jorge Cerame

113.  At all relevant times, Mr. Cerame intended for the facility to release emissions of EtO and was personally responsible for those intended emissions.

114.  Mr. Cerame knew that the intended emissions of EtO from the facility would make contact with and be inhaled by the individuals living in close proximity to the facility, which included Plaintiffs.

115.  Mr. Cerame also knew to a substantial certainty that inhalation of EtO would cause serious health risks and increased risks of cancer to those individuals living in close proximity to the facility who inhaled the chemical.

116.  The Plaintiffs did not know that they were inhaling EtO until within the last year and thus had never consented to making contact with or inhaling the chemical; nor do they consent to inhaling EtO today.

117.  As a direct and proximate result of the facility's emissions of EtO, Plaintiffs were contacted by and inhaled dangerous levels of EtO without their consent.

118.  As a direct and proximate result of their nonconsensual inhalation of the intended emissions of EtO from the facility, Plaintiffs developed cancer and have an increased risk of further serious health risks and medical conditions.

## Count 8 – Negligence of Don Eastepp

119.  Mr. Eastepp, in connection with designation as a PRO, was specifically delegated duties owed by Union Carbide / and Dow to Plaintiffs.

120.  Mr. Eastepp failed to exercise reasonable care and breached duties to Plaintiffs by allowing the facility to continue to emit EtO, in amounts that created an unreasonable and foreseeable

risk of harm to persons located in the surrounding areas, including the Plaintiffs, and by allowing permit violations, which, on information and belief, contributed to the unsafe levels of EtO in the ambient air, despite his own personal knowledge of the health risks and increased risk of cancer posed by the high level of emissions.

121. Instead of taking steps that he had the personal ability to take to implement designs or systems that would reduce the levels of dangerous emissions of EtO and warn the facility's neighbors as to the health risks the facility created by EtO, Mr. Eastepp caused Plaintiffs to be exposed to dangerous levels of EtO from the facility.

122. Mr. Eastepp has had actual knowledge of the risk to Plaintiffs as a result of the emission of EtO from the facility and breached the duty owed to Plaintiffs that was delegated to him by Union Carbide and/or Dow, which could not be further delegated to subordinates by state regulations, by exposing Plaintiffs to unsafe amounts of EtO.

123. Mr. Eastepp's breach of the personal duty to Plaintiffs is a specific cause of Plaintiffs' damages; her acts and omissions were and continue to be a significant contributing cause of the Plaintiffs' harms.

### Count 9 – Civil Battery by Don Eastepp

124. At all relevant times, Mr. Eastepp intended for the facility to release emissions of EtO and was personally responsible for those intended emissions.

125. Mr. Eastepp knew that the intended emissions of EtO from the facility would make contact with and be inhaled by the individuals living in close proximity to the facility, which included Plaintiffs.

126. Mr. Eastepp also knew to a substantial certainty that inhalation of EtO would cause serious health risks and increased risks of cancer to those individuals living in close proximity to the facility who inhaled the chemical.

127. The Plaintiffs did not know that they were inhaling EtO until within the last year and thus had never consented to making contact with or inhaling the chemical; nor do they consent to inhaling EtO today.

128. As a direct and proximate result of the facility's emissions of EtO, Plaintiffs were contacted by and inhaled dangerous levels of EtO without their consent.

129. As a direct and proximate result of their nonconsensual inhalation of the intended emissions of EtO from the facility, Plaintiffs developed cancer and have an increased risk of further serious health risks and medical conditions.

### Count 10 – Negligence of Brian Eiler

130. Mr. Eiler, in connection with designation as a PRO, was specifically delegated duties owed by Union Carbide / and Dow to Plaintiffs.

131. Mr. Eiler failed to exercise reasonable care and breached duties to Plaintiffs by allowing the facility to continue to emit EtO, in amounts that created an unreasonable and foreseeable risk of harm to persons located in the surrounding areas, including the Plaintiffs, and by allowing permit violations, which, on information and belief, contributed to the unsafe levels of EtO in the ambient air, despite his own personal knowledge of the health risks and increased risk of cancer posed by the high level of emissions.

132. Instead of taking steps that he had the personal ability to take to implement designs or systems that would reduce the levels of dangerous emissions of EtO and warn the facility's neighbors as to the health risks the facility created by EtO, Mr. Eiler caused Plaintiffs to be exposed to dangerous levels of EtO from the facility.

133. Mr. Eiler has had actual knowledge of the risk to Plaintiffs as a result of the emission of EtO from the facility and breached the duty owed to Plaintiffs that was delegated to him by Union Carbide and/or Dow, which could not be further delegated to subordinates by state regulations, by exposing Plaintiffs to unsafe amounts of EtO.

134. Mr. Eiler's breach of the personal duty to Plaintiffs is a specific cause of Plaintiffs' damages; her acts and omissions were and continue to be a significant contributing cause of the Plaintiffs' harms.

### Count 11 – Civil Battery by Brian Eiler

135. At all relevant times, Mr. Eiler intended for the facility to release emissions of EtO and was personally responsible for those intended emissions.

136. Mr. Eiler knew that the intended emissions of EtO from the facility would make contact with and be inhaled by the individuals living in close proximity to the facility, which included Plaintiffs.

137.  Mr. Eiler also knew to a substantial certainty that inhalation of EtO would cause serious health risks and increased risks of cancer to those individuals living in close proximity to the facility who inhaled the chemical.

138.  The Plaintiffs did not know that they were inhaling EtO until within the last year and thus had never consented to making contact with or inhaling the chemical; nor do they consent to inhaling EtO today.

139.  As a direct and proximate result of the facility's emissions of EtO, Plaintiffs were contacted by and inhaled dangerous levels of EtO without their consent.

140.  As a direct and proximate result of their nonconsensual inhalation of the intended emissions of EtO from the facility, Plaintiffs developed cancer and have an increased risk of further serious health risks and medical conditions.

**Count 12 – Negligence of Michael Faulkner**

141.  Mr. Faulkner, in connection with designation as a PRO, was specifically delegated duties owed by Union Carbide / and Dow to Plaintiffs.

142.  Mr. Faulkner failed to exercise reasonable care and breached duties to Plaintiffs by allowing the facility to continue to emit EtO, in amounts that created an unreasonable and foreseeable risk of harm to persons located in the surrounding areas, including the Plaintiffs, and by allowing permit violations, which, on information and belief, contributed to the unsafe levels of EtO in the ambient air, despite his own personal knowledge of the health risks and increased risk of cancer posed by the high level of emissions.

143.  Instead of taking steps that he had the personal ability to take to implement designs or systems that would reduce the levels of dangerous emissions of EtO and warn the facility's neighbors as to the health risks the facility created by EtO, Mr. Faulkner caused Plaintiffs to be exposed to dangerous levels of EtO from the facility.

144.  Mr. Faulkner has had actual knowledge of the risk to Plaintiffs as a result of the emission of EtO from the facility and breached the duty owed to Plaintiffs that was delegated to him by Union Carbide and/or Dow, which could not be further delegated to subordinates by state regulations, by exposing Plaintiffs to unsafe amounts of EtO.

145.  Mr. Faulkner's breach of the personal duty to Plaintiffs is a specific cause of Plaintiffs' damages; her acts and omissions were and continue to be a significant contributing cause of the Plaintiffs' harms.

**Count 13 – Civil Battery by Michael Faulkner**

146. At all relevant times, Mr. Faulkner intended for the facility to release emissions of EtO and was personally responsible for those intended emissions.

147. Mr. Faulkner knew that the intended emissions of EtO from the facility would make contact with and be inhaled by the individuals living in close proximity to the facility, which included Plaintiffs.

148. Mr. Faulkner also knew to a substantial certainty that inhalation of EtO would cause serious health risks and increased risks of cancer to those individuals living in close proximity to the facility who inhaled the chemical.

149. The Plaintiffs did not know that they were inhaling EtO until within the last year and thus had never consented to making contact with or inhaling the chemical; nor do they consent to inhaling EtO today.

150. As a direct and proximate result of the facility's emissions of EtO, Plaintiffs were contacted by and inhaled dangerous levels of EtO without their consent.

151. As a direct and proximate result of their nonconsensual inhalation of the intended emissions of EtO from the facility, Plaintiffs developed cancer and have an increased risk of further serious health risks and medical conditions.

## DAMAGES

152. Because of the aforementioned intentional misconduct and negligence of defendants, Plaintiffs have suffered severe and disabling injuries, for which they seek the following damages:

    a.) Past, present, and future pain and suffering;

    b.) Past, present, and future medical expenses;

    c.) Permanent and/or partial physical disability and/or impairment;

    d.) Scarring and disfigurement;

    e.) Past, present, and future loss of enjoyment of life;

    f.) Future loss of income;

    g.) Future loss of earning capacity;

    h.) The fear and increased likelihood of development of cancer and other fatal and debilitating diseases;

i.) The fear and increased likelihood of development of damage to vital organs, reproductive system and central nervous system

j.) The fear of early death.

153. Plaintiffs prays for a trial by jury.

WHEREFORE, Plaintiffs pray that, after due proceedings had, there be judgment herein in favor of Plaintiffs and against Defendants for such damages as are reasonable in the premises, together with legal interest thereon from date of judicial demand until paid; for all costs of this proceeding; and for all other general and equitable relief to which they are entitled.

Respectfully Submitted:

**RICHARD P. VOORHIES III (#30782)**
**WILLIAM A. BAROUSSE (#29748)**
THE VOORHIES LAW FIRM
1100 Poydras Street
Energy Center, Suite 2810
New Orleans, LA 70163
Phone: 504-875-2223
Fax: 504-875-4882
Email: richard@voorhieslaw.com
Email: william@voorhieslaw.com

-and-

**JENNIFER THORNTON (#27109)**
**WILLIAM M. ROSS (#27064)**
STANLEY, REUTER, ROSS, THORNTON
  & ALFORD, LLC
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Phone: 504-523-1580
Fax: 504-524-0069

PLEASE SERVE:

DOW CHEMICAL COMPANY
THROUGH ITS AGENT FOR SERVICE OF PROCESS
CT CORPORATION SYSTEM
3867 PLAZA TOWER DRIVE
BATON ROUGE, LA 70816

UNION CARBIDE CORPORATION
THROUGH ITS AGENT FOR SERVICE OF PROCESS
CT CORPORATION SYSTEM
3867 PLAZA TOWER DRIVE
BATON ROUGE, LA 70816

JACKIE YAWORSKI
806 SOLOMON PL.

NEW ORLEANS, LA

JORGE CERAME
2312 ORMOND BLVD.
DESTREHAN, LA 70047-2102

BRIAN EILER
ELMWOOD DR.
DESTREHAN, LA 70047-3703

DONALD EASTEPP
217 LAUREL CT
LULING, LA 70070-3205

MICHAEL FAULKNER
1330 WOODMERE DR,
MANDEVILLE, LA 70471-7456

**CERTIFICATE OF THE CLERK**

I hereby certify that a copy of the foregoing motion
and/or order has been mailed to all counsel of record
this _____ day of _____ 20__

By _____

Lanee Marino
Clerk of Court

26